Calling Case 17-6073 Charlotte Winkler v. Madison County Kentucky, et al. Oral arguments 15 minutes for presenting, 15 minutes to share about the evidence. Mr. Kramer for the admonition. On behalf of Charlotte Winkler, who's the administrator of the estate of her son, Clint Hacker, Brandon Clint Hacker, on behalf of the estate, I would submit to you that the summary judgment decision of the district court should be reversed. In April of 2014, Clint Hacker was arrested essentially because he was behind on his child support. Five days later, that arrest turned into a death sentence because despite his repeated requests, he never got the medical assistance that he was asking for. That, I would submit, is a violation of Clint Hacker's constitutional rights to be free from the deprivation of life, liberty, and property without due process of law under the 14th Amendment. But a strict liability? Is that what you're arguing? No, Your Honor. I don't believe it's strict liability at all, but I believe under the facts of this case, in a situation where an inmate, as Mr. Hacker was doing, made repeated pleas for medical assistance, not only to the jailer, but even going as far as calling his grandmother multiple times from the booking station and asking her to call an ambulance or to call in to the jail and have him released. Or have him transported to the hospital, which were the facts of this case in the record. It does demonstrate deliberate indifference. That's the standard. That's not what you started out. You said because he was denied his medical treatment that he should have received, there is a constitutional violation. I think that's basically what you started out saying. That's not correct, is it? Because he was denied his medical treatment that he was asking for repeatedly. Well, no, if the defendants were deliberately indifferent, then he's entitled to redress of a constitutional violation. And that certainly is the standard, and I would submit that under these facts, and in any case like this one, that that is the definition of indifference, is receiving the pleas and essentially doing very little. Each time he, as I recall, there were so many times where he asked for help. Yes, Your Honor. I don't, as I recall, there wasn't a time where no one responded. The regrettable circumstances here is that they responded, but they thought he had, they thought his problems emanated from detoxing, detoxing from overdosing. Yes, there are certainly at least some of the defendants thought that he was withdrawing from heroin and that was the source of his problem. He thought that was his problem, too, didn't he? You know, that's not very clear. Obviously, we don't have his testimony. All we have from him are a few notations made in the record of the, first, a few notations made in the record, mostly by Nurse Johnson, the LPN, who was on site on Friday afternoon, and a little bit of testimony from another inmate whose testimony frankly was a little bit all over the board, but whose testimony was that they had talked about detox. So there's certainly some evidence that he thought that's what was going on. It's not clear, it's not entirely clear to me, there's not a lot of evidence in my view. More importantly, I think this young man who had a high school GED was far from a medical doctor and probably wasn't the best person to be diagnosing his own conditions even. Is there anything in the record that, where he told any of the medical or jail personnel that he had had ulcer problems in the past? No, and Your Honor, there's nothing in the record other than one very brief statement from Stephen Denny, who's that other inmate who helped him. Yeah, that's just the other inmate. That's the only suggestion that Mr. Hacker even knew himself that he had a history of ulcers. This was not a man who went to the doctor frequently. He was in his mid-30s. His girlfriend, who had been a long-time living girlfriend, his mother and his grandmother, who he lived with at the time just before he was incarcerated, all testified that, the girlfriend of the grandmother testified that they had never heard him say anything about an ulcer. The mother was not asked that. Okay, so now we're circling back to the point that in order to find a constitutional violation here, we need to find that jail personnel had some inkling that the symptoms that they were seeing and that he was experiencing and that he complained about were something other than the suspected and very properly suspected overdose. Yes, Your Honor, I think that... Detox. It's not detox. It's something else. Withdrawal. Yes. And that goes back to your original question that I don't think... We're still there. We're looking for where in the record you point for your best evidence of knowing that the symptomology paralleled to ulcer and withdrawal. The best evidence of somebody who knew darn well that this was not withdrawal and it was an ulcer problem. I mean, a fatal kind of horrible ulcer problem. And I think the answer to that is twofold, Your Honor. Number one, I think it's clear that nobody ever knew that he knew subjectively knew specifically that he was suffering from... Or ought to have known. I mean, it has to be deliberate. Yes, ma'am. And that goes to your original question of did they respond every time that he had a complaint? And I would argue that they did not. Certainly, each time there was a complaint, he was making that complaint to a person. But Whitney Bratcher testified, and she's the one that the district court said was a very close case. She testified that she dropped off his breakfast tray. He couldn't get up off the floor. She made no further inquiry into that, even though she was the person who packed his medications and knew he was sick. A little bit earlier in the night, the jailer, and forgive me that I'm blanking on his name, Trickler, Jailer Trickler, who was there a couple hours earlier in the night, who did talk to Mr. Hacker. He talked to him through the door, which this court has, in other cases, says is not sufficient. Mr. Hacker told him, I'm really going through it. I'm very sick. Mr. Trickler made no inquiry into that, made no report. He knew that he was scheduled to see medical personnel a few hours later that day, though, didn't he? I believe there's suggestion that he knew that the next morning he was scheduled. This was at 3.30 in the morning, wasn't it? Yes, yes, it was. How do you distinguish? Are you familiar with the case of Rouster v. County of Saginaw, this court's decision in 2014? Yes. How do you distinguish that? Because it looks very parallel to me. The decedent died due to a perforated ulcer, just like here. They thought it was just gas and diarrhea, but they never knew the critical fact that he had had a perforated ulcer the prior year. It sounds very parallel. How do you distinguish that? It is a very similar case, Your Honor, and I think there are some distinguishing factors as well. The first is from the knowledge of the inmate in the Rouster case. The inmate certainly had prior treatment where there's no evidence that Mr. Hacker even knew that he had a previous ulcer or disease. That seems like it would hurt you more than help you. Well, I think it creates a duty to inquire on the medical providers to see what's going on. But also in the Rouster case, there was more care provided. And if you read the facts carefully of that case, that gentleman was – the primary complaints, as I read them, is that he was exhibiting very bizarre psychiatric-type symptoms, drinking from a toilet, that sort of thing. He was having alcohol withdrawal. And he was having alcohol withdrawal, which very distinct – and this is important – very distinct from drug withdrawal. Alcohol withdrawal is in itself a fatal condition that must be treated. Drug withdrawal, opiate withdrawal, is an uncomfortable condition that you're going to come out of unless there's some other deadly or fatal process. This court still found there was no deliberate indifference in Rouster, right? That's right. And as I read the court's decision in that case, much of that is made because the nurse had arranged for and had actually – and the inmate had actually had a psychiatric or psychological evaluation for these psychiatric problems. So there was real treatment being made. One, he was being treated for a deadly condition, alcohol withdrawal, that apparently he did have. Number two, he actually received the psychiatric evaluation. So there were some very, very particular things that were done and very particular providers that he saw. In this case, you had deputy jailers who were treating him with nothing more than one or two phone calls to a physician. Well, the medication was prescribed for what they thought was withdrawal problems. To treat the symptoms of withdrawal. Right. I mean, what bothers me a little bit is you may have a malpractice claim. There may be negligence on what the medical staff did or didn't do. But that's not enough for deliberate indifference as a constitutional violation, right? I mean, you've got a state law malpractice claim that you can still pursue. I agree with that, and Judge Caldwell obviously dismissed those without prejudice and left them open to be refiled in state court. But as far as the deliberate indifference case, I think this is more than malpractice. Because malpractice is negligently making a mistake in the treatment. In this case, there really was no treatment. There is a treatment of a symptom of something that could have been causing him discomfort without, and this is another very important point, without ever making an inquiry in any sort of depth or detail into whether that discomfort was a result of withdrawal, which is not a dangerous condition. Very different from making an inquiry or looking to see if there is a deadly condition, asking the questions to see if he's really going through withdrawal, taking a history. You just told us the gentleman doesn't have education. How would he be able to offer – I'm going to let you answer for a moment. What really do you foresee that would have been the better answer there? Your Honor, I think the history I'm referring to is not do you have ulcers. The history is tell me about your drug withdrawal. Because our expert witness who's in the record said that the timing of these symptoms do not make sense and do not correlate to drug withdrawal. If he were actually withdrawing, he would have begun these symptoms much sooner in his stay. That was never inquired into. Thank you, Your Honors. Good morning. May it please the Court, Mr. Braithwaite, Mr. Camden. My name is Barry Stills, and I represent the Madison County defendants in this case. Both its jailer, Doug Thomas, Tom Jones, J.J. LaGrange, Keith Trickler, Whitney Bratcher, and Corey Dunning, as well as the county itself. Your Honor, we believe that the district court properly granted a summary judgment in this case. On the 1983 claims, for the simple purpose that there was absolutely no proof of deliberate indifference on my client's part. They did not ignore nor did they deliberately not do anything to help Mr. Hacker. Counsel just argued that they had their duty as jailers included inquiring in more depth about his symptomology. I think I was just told it was about the timing. They ought to have known that withdrawal . . . you show withdrawal signs earlier. I think that counsel explained the expert. To avoid qualified immunity in this case, Your Honor, which is what the district court found, it's the plaintiff's burden to show a case that's substantially similar to show a clearly established right. I will agree that there's a clearly established right under the 14th Amendment for pretrial detainees to have medical treatment same as anybody else in the community. But they did . . . this man was being treated for withdrawal symptoms, drug withdrawal symptoms. It's very unfortunate what happened to this gentleman, but it's no different than what happened, as Judge Gilman pointed out, no different than what happened in the Gilman case. No different than . . . Not the Gilman case. Royster. Royster. I'm sorry, sir. Don't hold that against me, Judge. I'm sorry. There's this . . . He's been sober for a while. There's absolutely no proof, Your Honor, that there was any kind of deliberate indifference in this case that my clients exhibited toward Mr. Hacker's condition. When he made complaints, Deputy Jailor Thomas . . . I'm sorry, Deputy Jailor Jones, Deputy Jailor LaGrange made inquiry to the on-call physician. He made recommendations. Those were followed through. He made a point of Captain Keith Trickler seeing him about 3.30 in the morning, the morning that he died. What Captain Trickler did was he went in. He says that he talked to him through the door. That's not accurate. He talked to him. He said he was at the door, and he was only about 6 feet away from him, and he gave him his pills. Unless he threw his pills to him, which there's no proof of that, he saw this gentleman, asked him what was going . . . what was wrong, and he said he was really going through it. He was pill sick or dope sick or something of that nature. He knew he was dope . . . or he thought he was dope sick. That's what everybody at the Madison County Detention Center thought. They certainly did not . . . did not have any kind of inkling that this man was suffering from a ruptured duodenal ulcer. He makes a point about another deputy by the name of Whitney Bratcher. He claims that Ms. Bratcher testified that Mr. Hacker, when she came to serve his breakfast tray at 5.30 that morning, couldn't get up. That's not true. What she testified to was he didn't get up, which is not an unusual event in a county jail for people not to get up, not to come get their breakfast trays. He was sleeping. There's absolutely no proof from any inmates or anything like that that he was complaining or saying anything to Whitney Bratcher that he needed some medical attention. That's not in the record anywhere. He asked his grandmother . . . he told his grandmother he wanted to go to the hospital. Did he tell any . . . I don't remember whether he told any personnel at the jail. No proof of that. Ms. Hacker, his grandmother, said she had called somebody she couldn't remember who and said he needs medical attention or something to that effect. The reply was that he's being monitored, which he was. Like all inmates at the Madison County Detention Center, they're checked hourly or whatever. There was no call from Dr. Alshami, the on-call physician, that he needed to be checked anymore or monitored anymore. All he was told . . . all Captain Tom Jones was told he needed to be monitored, which he was, like all other detainees that day. Captain Jones testified that if Dr. Alshami had required more monitoring, he would certainly have said that, and he didn't. There's simply no proof, Your Honors, that there's any deliberate indifference, which is the standard under a 14th Amendment denial of medical care or inaction of medical care. And there's certainly no proof that there was any kind of scienter intent on my clients to inflict any kind of punishment. Now, granted, he probably doesn't have to show that it was his punishment for punishment's sake, but it has to be more than negligence. And I'm not going to agree that he has a negligence claim because I don't think he has a negligence claim. I think that qualified immunity would preclude that. The cases that he cites are all distinguishable. The Westover case, a 1976 case from this court, dealt with an ulcer and a special diet that everyone knew, and they didn't attend to it. The Phillips v. Roane County case, everyone knew this lady was a diabetic. She had a stroke, basically, or passed out in the cell. They found her unconscious with no pulse, and the EMTs came and they revived her. And the captain on duty said, if she's not in distress, just leave her there. Don't take her to the hospital. That went on for two weeks, that kind of treatment. That treatment was found to be deliberate indifference. That's not present here. That kind of actions are not present here with regard to the custodial staff at all in this case. They've also made claims of failure to train, improper policies and all that. There's no proof of that. There's no proof that our training policies are inadequate. They're not. They comply with Kentucky regulations that are required for training of jail guards, which includes a medical component. I know my time is up. For the reasons stated here today, maybe inartfully, and I apologize for having a case name wrong, and the reasons stated in our briefs, we believe that Judge Caldwell's well-reasoned opinion should be affirmed in all respects. Thank you for your time. Thank you. Good morning. May it please the Court. Mr. Prather, Mr. Steeles, my name is Andy Camden. I'm here on behalf of what I call the ACH appellees, I guess at this point, the medical providers. And we, too, believe that the district court correctly applied the facts in this case to Sixth Circuit precedent in granting the summary judgment on the constitutional claims put forward by the plaintiff against the medical care providers. The appellant failed to produce any evidence to support the contention that any of the ACH folks knew of facts to allow for an inference to be drawn that a substantial risk of serious harm existed. It's important, in reviewing this decision of the district court, to note that an incorrect diagnosis or failure to make the correct diagnosis does not equal deliberate indifference. What may seem in hindsight to be negligent or even careless does not a constitutional claim make. A crucial fact that's already been pointed out in this case, in every interaction that Mr. Hacker had with one of the ACH employees, he indicated that he felt like, in some words, he said, I'm going through withdrawal. I'm dope sick. I'm really going through withdrawal. I'm trying to get through it by myself. Every time he interacted with an ACH employee, he gave that medical history. His symptoms fit with that medical history. There was no need for them to investigate further when the patient is telling you, here's what I think is wrong with me, and when his symptoms match up with what he thinks is wrong with him. Although, I mean, you have to concede it was a misdiagnosis, right? No question that facts tell us after the fact it was a misdiagnosis. Certainly by the end, he was having symptoms related to the ulcer. The first interaction on May 2nd could have been both withdrawal and an ulcer. It could have been both things going on. Unfortunately for him, both things going on at the same time. Sure. Now, I assume the medical field has to know that, well, there are two possibilities with these kind of symptoms. One could be withdrawal from drugs. Another could be a perforated ulcer problem. And I imagine that there's more than two. There may be more than two. Right. And that's why when you're told by the patient, it's not that he thought he was going through withdrawal. For him to think he was going through withdrawal, he had to know that he had used drugs that he could be withdrawing from. When he got to the jail and did the intake forms, he denied having used drugs. Right. We've got inconsistent information. And then once the symptoms kick in, he's like, well, okay.  Was there a duty on behalf of your medical clients to think, well, you know, we need to have an obligation to check beyond just what he says the problem is? Even if the symptoms are consistent with withdrawal, hey, there could be, you know, ulcers, could be a third or fourth problem that has the same symptoms. I think a duty to investigate further would develop if this condition persisted beyond the limited time frame that it persisted in this case. Our experts will state that he was going through these withdrawal symptoms as they were perceived were certainly within the time frame when withdrawal symptoms could still be in existence. Now, if we get to the Tuesday after he died or the Wednesday and he's still having symptoms and the medication they prescribed for withdrawal is not effective, then you've got to investigate further. So I don't think a duty to investigate further arose during the course of time that they were providing treatment. All this occurred in a span of five days, right, from his arrest to his death? Correct. We've got the first, well, not from the, the first medical request is on Friday, then the next ones are on Sunday, and then he dies on Monday. But he had been in jail two days before the first medical request came in. It was discussed earlier, the Rouster case, which was discussed as very similar. Interesting distinction in the Rouster case, they were treating him with alcohol withdrawal or for alcohol withdrawal. They were doing that based on suspicion. The patient didn't say or the inmate didn't say, I'm having alcohol withdrawal. One of the jail staff said, well, his reputation is that he drinks a lot. So they were treating him based on a rumor, where in this case we were treating the patient based on what he had told us. So, again, also there is also present here. Nobody in the Rouster case knew of that inmate's history with ulcer diagnosis. Here, also, nobody had mentioned to any of the jail staff or any of the medical staff that there was a problem with ulcers in this, in Mr. Hacker. One other interesting, or one other important distinction from the. . . I'm sorry. Do your clients, the medical experts, I assume that this is, they suspect both, that he is having withdrawal exacerbated by an ulcer? Or do ulcers get triggered by ingestion of the drugs? I don't know that the ingestion of drugs triggers the ulcers. I think the ulcers would have been an underlying condition that's just superimposed on the drug use. Right. But everybody still thinks he was having withdrawal. Did the docs? Yes. I mean, retrospectively, you mean? Yes. They think that it's certainly possible that he was going through withdrawal and had this ulcer complication. Now, whether the withdrawal complicated the ulcer, no one has. . . Right. Nobody's tied that. I'm not sure that that can be known. But what I was going to state was in the cases where summary judgment was not upheld, all of those cases had a situation where some portion of the jail staff knew of a medical condition. Either in the Shadrick case, they knew that the inmate, when he came to the jail, had MRSA. He showed them the signs of his staph infection. Just like in the Sowers case, they knew that the patient had diabetes. They knew he had not taken insulin in several days. They knew he'd run out of insulin. And so in all of those cases, there's knowledge that is not acted upon. That's not present in this case. Nobody told them that there was an ulcer problem. With respect to each of the ACH individuals, Layla Troutman was the nurse practitioner. She only had one interaction with Mr. Hacker. That was when she received a call, the initial complaint. He thinks he's got a history of drug use and he's got these symptoms that match up with opiate withdrawal. She made an appropriate, a reasonable decision to provide medication for his opiate withdrawal. Then Dr. Alshami was called on Sunday. He's told the patient thinks he's dope sick. Here's his symptoms. He made a reasonable decision to treat the symptoms that seemed like opiate withdrawal. And then Nurse Johnson, as an LPN, is simply reporting symptoms that she sees. By licensure, she can't do a physical exam or make a diagnosis. She just communicates that information, which she did to Nurse Troutman, and then communicated to Dr. Alshami on the morning that Mr. Hacker passed away. Again, to sum up, the distinction in this case to cases where there has been deliberate indifference is that no one knew of the ulcer condition. The ACH defendants did not know that there was a risk of substantial harm. And based on those facts, we believe that the district court opinion should be affirmed. Thank you, counsel. Mr. Prather. Thank you, Your Honor. As one point of clarification on the facts, our expert, Dr. Goldenson, who's a physician and prison medical specialist, it was his opinion that Mr. Hacker was not going through withdrawal. Is it possible that he was? I can't say that it's not. But his opinion was that because of the timing, he was not going through withdrawal at the time that his symptoms were all a result of the peptic ulcer disease. That seems a little at odds with the idea that he, by his own diagnosis, admits to apparently sufficient drug use in his mind to trigger withdrawal. In his mind, quite possibly. And that's why it's important to ask questions. He would have known that, right? If you're the guy who's taking heroin, you kind of know it. He certainly would have known that. What wasn't asked was, when was your last dose? How much have you been taking it? How long have you been taking it? Those are all factors that go into withdrawal that no one ever inquired into in this case. And on the differential diagnosis, I think Judge Gilman brought up the idea that you look for other causes of the harm. Certainly, the medical standard is you look not only for the most likely, but for the most serious. Did your expert say that the symptoms that he exhibited, though, were inconsistent with drug withdrawal? He never said that directly. He said that the medical records or the medical history overall was not consistent with drug withdrawal. And I took that, my understanding of that, and I'm obviously not a doctor, but my understanding of that testimony was that that was a result of the timing of the onset of the symptoms, or at least of the complaints, to the jail staff. In terms of policies, we didn't get to talk very much earlier about the ACH employees, but Dr. Alshami was the medical doctor. He was the one who held the keys here, who knew the questions to ask or should have known the questions to ask in a prison medical, jail medical setting, and who could have instructed the jailers who had not had any training or were the only health care providers, if you would, there over the weekend. And then you have Nurse Johnson, who, according to the evidence in the case, is an LPN. As Mr. Camden said, it's not qualified to assess patients, but she was doing that because in the discovery that we got of the phone calls that she could call providers over the six days that Mr. Hacker was in the jail, she only made, or anyone from the jail, not only her, many of these were late at night, only made 19 calls to the medical providers. That's less than three per day for a jail population of over 300 people. She was seeing a lot more patients in that day without any other medical supervision. But one other point, I would ask the court to consider looking at what some other circuits have done. This is in our brief, but this goes to Judge Cook's original question, I think, of a lot of small things that were missed, perhaps, by jailers throughout. And at least the 9th, 10th, and 11th circuits, and probably others, have said that there can be an underlying, there can be a constitutional violation by the provider, by ACH, or by the jail, even without a definable constitutional violation by a particular actor, if the cumulative effect of many violations adds up to a deprivation of the constitutional rights. I understand that that's not currently the law in the 6th Circuit, but other circuits have accepted that rule, and I think this case demonstrates why that is a good rule, because you have a situation where a number of actors are making a number of small decisions that are, in my view, indifferent, independently indifferent, but even if not independently indifferent, deliberately indifferent, the cumulative effect of them was a deprivation of Mr. Hacker's constitutional rights. I see that my time has expired. I thank you for your consideration, and I'm going to ask for reversal of the district court's decision. All right. Thank you, Mr. Prather. The court has your matter. We will consider it carefully and issue an opinion in due course. Thank you.